UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JUSTIN WAHLER,

              Plaintiff,

   -vs-

CAROLYN W. COLVIN, Commissioner of
Social Security,

              Defendant.

_____

**DECISION and ORDER
No. 1:11-CV-1096(MAT)**

## I.  Introduction

Plaintiff Justin Wahler ("Plaintiff"), represented by counsel, brings this action pursuant to Title II and Title XVI of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner")[1] denying his applications for Disability Insurance Benefits ("DIB") and Social Security Insurance ("SSI"). This Court has jurisdiction over the matter pursuant to 42 U.S.C. §§ 405(g), 1383(c). Presently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

---

[1]     Carolyn W. Colvin has replaced Michael J. Astrue as the Commissioner of Social Security. She therefore is automatically substituted as the defendant in this action pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

## II.   Procedural History

On July 2, 2009, Plaintiff protectively filed concurrent applications for DIB and SSI, alleging disability since July 31, 2007, due to post-traumatic stress disorder ("PTSD"), agoraphobia, and panic attacks. T.151-52, 159.[2] These applications were denied. T.50-55. Plaintiff requested a hearing, which was held via videoconference before Administrative Law Judge Stanley K. Chin ("the ALJ") on March 29, 2011. T.12-31. On April 4, 2011, the ALJ issued a decision finding Plaintiff not disabled under the Act. T.36-49. The ALJ's decision became the final decision of the Commissioner on November 17, 2011, when the Appeals Council denied Plaintiff's request for review. This timely action followed.

## III.  Summary of the Administrative Record

### A.    Medical History

On October 5, 2007, Plaintiff presented for treatment at the ACT Corporation ("ACT") in Daytona Beach, Florida. See T.231-36. He reported a history of depression and anxiety since the fifth grade. He had bad dreams and only could sleep for two hours at a time. Plaintiff was previously treated by his primary care physician who had prescribed paroxetine (Paxil). Triage screener D. Walker noted that, on examination, Plaintiff appeared neat and clean, but had a depressed affect and a blunted mood. He had suicidal ideation but

---

[2]

Citations to "T." refer to pages from the administrative transcript filed by the Commissioner as part of her Answer.

no plan. He had racing, confused thoughts, and poor impulse control. He had good short- and long-term memory and was able to stay on task. His speech was clear, and he had fair insight and judgment. Diagnoses were depressive disorder not otherwise specified ("NOS") on Axis I, and "deferred" diagnosis on Axis II. Therapy was recommended for his depression and anxiety. See T.231-36.

Plaintiff returned to ACT on November 7, 2007, complaining of depression, anxiety, panic attacks, and sleeplessness. See T.218-19, 223-30. Advanced Registered Nurse Practitioner Elissa Emerson ("ARNP Emerson") evaluated Plaintiff's mental status and cognitive functioning. Plaintiff was neat and cooperative; his speech was hyper and scattered, but relevant; he compulsively washed his hands and vacuumed; but his thoughts were linear and not psychotic. He had suicidal thoughts every day or two, a "horribly depressed" mood, and a nervous affect. He was easily distracted except when engaged in artistic activities. Plaintiff had fair insight, judgment, and impulse control, and was able to do abstract thinking. He had a good-to-excellent memory, and at least average intellectual functioning. ARNP Emerson diagnosed depressive disorder NOS, panic disorder with agoraphobia, obsessive compulsive traits, and PTSD as a "rule out" diagnosis. T.218, 226. Plaintiff was prescribed Wellbutrin, Paxil, and Sinequan.

ARNP Emerson next saw Plaintiff on December 19, 2007. T.215-16. He still had suicidal thoughts and a depressed and nervous affect, and newly present paranoid thought content. ARNP Emerson substituted Effexor for Paxil, and increased the dosages of Wellbutrin and Remeron.

On February 1, 2008, Plaintiff reported that his medications were causing increased anger, flashbacks, sleeplessness, and loss of appetite. See T.213-14. ARNP Emerson discontinued Effexor and prescribed Seroquel. Diagnoses were depressive disorder, NOS; panic disorder with agoraphobia, and PTSD as a "rule out" diagnosis. T.213.

Plaintiff returned to ACT on March 28, 2008, with complaints of variable sleep, decreased appetite, anxiety, heart flutter, "lots of breakthrough symptoms", "horrible panic", and paranoia. See T.211-12. On examination, Plaintiff's mood was very anxious and his affect, mildly depressed. He had good attention, memory, and concentration; and his thoughts were stable with no cognitive deficits. He exhibited good impulse control, insight, and judgment, and reported no suicidal ideation. Seroquel was discontinued, Wellbutrin was increased, and Celexa was added. Diagnoses were depressive disorder, NOS; panic disorder with agoraphobia; and "poss[ible] PTSD ([following] attempted rape)." T.211.

On June 20, 2008, Plaintiff had an appointment at ACT and reported that he was "stressed out" and very anxious. See T.208-09.

-4-

He currently was enrolled in cosmetology school. On examination, Plaintiff had a depressed mood, fair attention and concentration, intact memory, and no suicidal ideation. His speech, affect, and impulse control were normal, and his thoughts were relevant and organized. The diagnosis was depressive disorder, NOS. T.208.

Clinical psychologist Ivan Fleishman, Psy. D., evaluated Plaintiff on September 10, 2008. Dr. Fleishman stated that Plaintiff had experienced "significant depressive episodes unrelated to life circumstances, suggesting an underlying biological or genetic component to his mood disorder." T.296. Based on Plaintiff's reported psychiatric history, Dr. Fleishman diagnosed dysthymia[3] and panic disorder and referred Plaintiff to a psychiatric nurse practitioner. T.296.

On September 17, 2008, Plaintiff presented for a psychiatric evaluation with Marianne McCool, ARNP ("ARNP McCool"), at Behavioral Health Ormond Beach. T.250-52, T.289-91. Plaintiff reported that his panic disorder had recurred in the past year, becoming more severe, with episodes occurring once per week. The panic attacks had caused him to pass out several times. Plaintiff also complained of generalized anxiety and a fear of crowds. About a year ago, he had isolated himself for several months. In recent

---

[3]

Dysthymia, or persistent depressive disorder, is a long-term (chronic) form of depression. See http://www.mayoclinic.org/diseases-conditions/mood-disorders/basics/definition/con-20035907 (last accessed Nov. 14, 2014).

weeks, his anxiety prevented him from attending classes. His current medications were Seroquel, Celexa, and Depakote. On examination, Plaintiff had a slightly worried mood and a mildly restricted affect. His thoughts included obsessive features, but he exhibited no hallucinations, delusions, or paranoia. He was not a danger to himself or others. Diagnoses were panic disorder with agoraphobia (300.21); generalized anxiety disorder (300.02); and PTSD (309.81). T.252. ARNP McCool prescribed Prozac, Xanax, and Seroquel and recommended therapy. T.252.

Plaintiff returned to see ARNP McCool on October 15, 2008. T.249, 288. He reported that Xanax was helping his mood but he still had panic attacks when he had attended class. On examination, Plaintiff had an anxious affect, and was still "negative about his ability to attend class". T.249. ARNP McCool increased Plaintiff's Prozac dosage and prescribed Niravam for panic attacks. Diagnoses were panic disorder with agoraphobia; generalized anxiety disorder; and PTSD.

On November 19, 2008, ARNP McCool noted that Plaintiff had experienced significant improvement on fluoxetine. T. 248, 287. On examination, Plaintiff had a euthymic mood and a full-range affect. His insight and judgment were improving. Plaintiff had responded very well to medication and had decided to return to school for his associate's degree. Diagnoses were panic disorder with agoraphobia,

generalized anxiety disorder, and MDD (major depressive disorder). T.248.

Plaintiff returned to ARNP McCool on January 19, 2009, reporting that his partner had been incarcerated for marijuana possession and that his mother recently had been hospitalized. Despite these stressors, ARNP McCool noted, Plaintiff was coping well. His mental status examination showed normal findings. ARNP McCool noted that Plaintiff's condition was much improved and that his panic attacks were less frequent. Diagnoses were panic disorder with agoraphobia; generalized anxiety disorder; and major depressive disorder. T.247, 286.

On March 16, 2009, Plaintiff reported to ARNP McCool that he had taken a whole bottle of Xanax during a panic attack in January, had never refilled the prescription and had since experienced terrible anxiety and sleeplessness. On examination, Plaintiff had an anxious mood, a nervous and serious affect, fair insight and judgment, normal cognition, and no suicidal ideation. ARNP McCool restarted Xanax, continued fluoxetine, and prescribed Trazodone. Diagnoses were panic disorder with agoraphobia, generalized anxiety disorder, major depressive disorder, and PTSD. T.246, 285.

On April 13, 2009, ARNP McCool noted that Plaintiff was having PTSD symptoms and homicidal thoughts directed toward one of his partner's friend because the friend resembled the person who had raped him (Plaintiff) four years earlier. T.245, T.284. Plaintiff

was stable, "working hard" on his anxiety issues, and was sleeping better on Trazodone, although it sometimes made him tired during the day. ARNP McCool discontinued Xanax because of its expense and substituted Valium. Diagnoses were generalized anxiety disorder, major depressive disorder, panic disorder with agoraphobia, and PTSD.

At his June 8, 2009, appointment with ARNP McCool, Plaintiff expressed interest in taking nursing assistant classes, but he was having financial difficulties. T.244, 283. He also complained of relationship problems stemming from his "caretaker" role. ARNP McCool prescribed a trial of Zyprexa, an atypical antipsychotic. Diagnoses were generalized anxiety disorder, major depressive disorder, and panic disorder with agoraphobia.

On September 1, 2009, Plaintiff complained to ARNP McCool about his ex-partner contacting his family members and making very serious, false accusations about him. T.243, 282. On examination, Plaintiff was hyperverbal, upset, anxious, angry, and had homicidal thoughts toward his ex-partner. Diagnoses were major depressive disorder, recorrent; generalized anxiety disorder; and panic disorder with agoraphobia.

At the request of a state Medical Disability Adjudicator, ARNP McCool completed a form dated October 15, 2009, regarding Plaintiff's mental health. T.239. When asked what Plaintiff still could do despite his impairments, ARNP McCool noted that although

Plaintiff is intelligent, he does not make progress on goals and does  not adapt to change. He would not be able to sustain work activity for eight hours a day, five days a week, because he has "extreme anxiety when dealing with the public." T.240. Diagnoses were PTSD, generalized anxiety disorder, and panic disorder with agoraphobia.

At the request of the Commissioner, David Clay, Ph.D., reviewed the evidence in Plaintiff's case but did not examine him personally. Dr. Clay completed a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment on October 29, 2009, see T.253-70, and evaluated Plaintiff's impairments under Listing 12.06 for anxiety-related disorders. T.257, 262, 267-68. With respect to the "B criteria,"[4] Plaintiff had "mild" restrictions in activities of daily living, "moderate" difficulties in maintaining social functioning, "mild" difficulties in maintaining concentration, persistence, or pace; and had experienced one or two episodes of decompensation of extended duration. T.255, 267. The evidence did not establish the presence of the "C criterion" for listing 12.06. According to Dr. Clay, Plaintiff had symptoms of PTSD and "possibly" generalized anxiety disorder, but "no obvious depression or psychosis". T.269. Dr. Clay

---

4

 To have a mental impairment qualify under Listing 12.06, the claimant must satisfy the criteria in both paragraphs A and B, or the criteria in both paragraphs A and C, of that listing. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, at § 12.06.

opined that Plaintiff could understand, retain, and carry out simple instructions; could consistently and usefully perform routine tasks on a sustained basis under normal supervision; and could cooperate effectively with the public and with coworkers in completing simple tasks and transactions. T.255. Dr. Clay noted that Plaintiff "[m]ay show limited tolerance" for frequent, recurrent contact with the general public, and "[w]ill function best" at performing tasks having "modest" social demands. T.255. Dr. Clay opined that Plaintiff "can adjust to the mental demands of most new task settings." T.255.

In November 2009, Plaintiff moved from Florida to New York, and no longer was able to see ARNP McCool consistently. On February 16, 2010, Plaintiff had a telephone consultation with ARNP McCool and reported frequent, debilitating panic attacks and two depressive episodes since moving. ARNP McCool noted that Plaintiff had a calm and euthymic mood, his thoughts were coherent and organized, and he had a full range affect with good insight and judgment. T.280. ARNP McCool diagnosed Plaintiff with generalized anxiety disorder, panic disorder, and mood disorder NOS. T.280. She prescribed Depakote, a mood stabilizer, in addition to Plaintiff's Valium, Trazodone, Zyprexa, and fluoxetine. T.280.

On February 18, 2010, ARNP McCool completed a Mental Residual Functional Capacity Questionnaire. See T.275-79. She diagnosed Plaintiff with mood disorder NOS, generalized anxiety disorder,

panic disorder with agoraphobia, and PTSD, with "rule out" diagnoses of dependent personality disorder and bipolar disorder. ARNP McCool indicated that Plaintiff initially had improved on Xanax, fluoxetine, and Trazodone. Due to family financial difficulties, however, he could not afford Xanax, so she prescribed Valium. Since moving to New York, Plaintiff had been socially isolated and had been unable to work because of anxiety and panic attacks. Currently, Plaintiff was taking fluoxetine, Valium, Trazodone, Zyprexa, and Tegretol.

With respect to Plaintiff's ability to perform "unskilled" work, ARNP McCool indicated that Plaintiff was "[u]nable to meet competitive standards" for dealing with normal work stress; he had been unable to deal with the stress of going to class in 2008, had quit school after several months, and had "not improved since that time." T.277 (emphasis in original). Plaintiff was "[s]eriously limited" in maintaining regular attendance and punctuality because he has "frequent panic attacks that would result in absences". He would miss about three to four days of work per month because of his impairments or treatment for those impairments. He was "[s]eriously limited" in completing a normal workday because of his "[d]ebilitating anxiety"; "[s]eriously limited" in performing at a consistent pace without needing unreasonable rest periods; and "[s]eriously limited" in responding appropriately to criticism from supervisors because such criticism would increase his anxiety,

depression, and paranoia. Plaintiff had "[l]imited but satisfactory" or "[u]nlimited" functioning in all other categories needed to perform "unskilled" work.

ARNP McCool further noted that Plaintiff was unable to meet competitive standards in interacting appropriately with the general public. He was seriously limited with regard to his ability to travel in an unfamiliar place or use public transportation. ARNP McCool explained that Plaintiff's anxiety was escalated by social situations, and he feared unfamiliar places. Plaintiff lacked the self-confidence necessary for using public transportation. He had limited but satisfactory functioning in the mental abilities needed for semiskilled and skilled work. ARNP McCool opined that Plaintiff could not engage in full-time competitive employment on a sustained basis. T.279.

**B.   Non-Medical Evidence**

Plaintiff testified that when driving he has experienced panic attacks which caused him to vomit and then pass out. A couple of years ago, he passed out in his car, and his parents decided that he should move back in with them and probably not drive anymore. T.19. Plaintiff testified that he typically wakes up at about 7:00 a.m. in terror, throw up, try to calm down a bit, and let his dog out. He testified, "then it's a lot of looking out the window, trying to keep intrusive thoughts from running [him] up a flag pole." T.19. In the evening, he has dinner with his parents and

watches television with his father. He "[a]bsolutely" does not go out to go shopping, to church, or even to get his mail. T.20. He testified that he has not met any new friends since moving to New York, and he does not keep in touch with his friends in Florida because the proposition of phone conversations is "terrifying". T.20. His panic attacks occur three times a week and last from a half-hour to an hour or more, or "usually until [he] pass[es] out." T.20. He is no longer on any medication or receiving therapy because he cannot afford it. T.21. He tries to use a breathing/acupressure technique he was taught but that "kind of prolongs" the panic attacks. The panic attacks start with a feeling of impending doom; his hands, face, and scalp sweat; his hands pulse and go numb; he breathes heavily and vomits; and then usually he "drop[s] out of consciousness." T.22. He has feelings that "people are out to get him" and believes that if he is out in public and shown to be mentally unfit, he will "be put into an institution . . . ." T.23. He has suicidal ideation and fear that if he does not get better, "no one will want [him] around" or "be able to take care of [him]" and he will "have to end [his] life." T.23. Plaintiff testified that now, due to his anxiety and depression, he has to be reminded to bathe and would not eat if someone did not cook for him.

C.    **Vocational Expert Testimony**

Vocational expert James Newtown ("the VE") testified that Plaintiff's past relevant work history was closest to what the Dictionary of Occupational Titles ("DOT") refers to as a "laborer" (922.687-058). The ALJ presented the VE with two hypotheticals. The first one involved a person of the same age and having the same work experience and education as Plaintiff, but who is limited to simple, routine, repetitive tasks performed in a work environment free of fast-paced production requirements, involving only simple work-related decisions and routine work-type changes; and who is limited to occasional interactions with co-workers. such a person could perform Plaintiff's past relevant work as it is actually performed in the national economy. The VE indicated that there were several other representative jobs that such a person could perform: dietary aid, cook helper, and laundry worker. T.29. The ALJ modified the first hypothetical by stating that the person "could have superficial and [sic] no direct interaction with the public" and "would be absent from work three days per month and would be unable to deal with normal work place stress." T.30. The VE testified that there were no jobs that such an individual could perform. In response to questions by Plaintiff's attorney, the VE testified that if the first hypothetical person were to be absent from work more than once a month, he would be incapable of sustaining employment. If the second hypothetical person were to be

absent more than one day a month, he also would not be able to sustain employment. T.30-31.

## III. The ALJ's Decision

In adjudicating Plaintiff's claim for DIB and SSI, the ALJ applied the five-step sequential analysis set forth in the administrative regulations. See 20 C.F.R. §§ 404.1520, 416.920.

At step one, the ALJ noted that although Plaintiff had engaged in some work activity following the alleged disability onset date, it did not rise to the level of substantial gainful activity. In addition, the ALJ found, Plaintiff met the insured status requirements of the Act through March 31, 2010. T.41.

At step two, the ALJ summarily concluded that Plaintiff has two "severe" impairments: generalized anxiety disorder and PTSD. T.41. At step three, the ALJ determined that Plaintiff's impairments, considered singly and in combination, do not meet or medically equals one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App'x 1. T.41. The ALJ specifically considered Listing 12.06 (Anxiety-Related Disorders) and found that Plaintiff has "mild" restriction in activities of daily living as he is able to provide for his own grooming, do laundry, clean his bathroom, and let his dog out to go to the bathroom. Plaintiff has "moderate" difficulties in social functioning, in light of his testimony that he lives at home with his parents, has no friends in his area, does not talk to anyone on the phone, and rarely leaves home. With

regard to maintaining concentration, persistence or pace, Plaintiff has "moderate" difficulties based on his testimony that when he starts to read, he sometimes drifts into his own thoughts and forgets he is reading. Finally, the ALJ found that Plaintiff had experienced no episodes of decompensation of extended duration. T.42.

Because Plaintiff's mental impairments do not cause at two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, the ALJ found that the Listing 12.06's "paragraph B" criteria were not satisfied. The ALJ also found that the evidence "fail[ed] to establish the presence" of Listing 12.06's "paragraph C" criteria.

The ALJ next assessed Plaintiff's residual functional capacity ("RFC") and concluded that he has the ability to perform a full range of work at all exertional levels, but with the following nonexertional limitations: simple, routine, and repetitive tasks; a work environment free of fast-paced production requirements, and involving only simple work-related decisions and routine work-place changes; and only occasional interactions with co-workers. T.42-43. In arriving at this RFC, the ALJ gave only "little weight" to ARNP McCool's opinion but gave "[g]reat weight" to the report of non-examining state agency review psychologist Dr. Clay. T.43.

At step four, the ALJ found that Plaintiff is no longer able to perform his past relevant work as a laborer due to his RFC.

-16-

Moving to step five, the ALJ relied on the testimony of the VE to conclude that, in light of Plaintiff's status as a "younger individual", his vocational and educational background, and his RFC, there were jobs existing in significant numbers in the national economy that he could perform. Accordingly, the ALJ found Plaintiff not disabled.

**IV.   Standard of Review**

Title 42 U.S.C., § 405(g) authorizes district courts "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  When evaluating a denial of disability benefits, the reviewing court may reverse the decision only if the Commissioner committed legal error or if her factual findings are not supported by substantial evidence. Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citing 42 U.S.C. § 405(g)). A district court's function thus is not to determine de novo whether a claimant is disabled. Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (citation omitted). However, a district must independently determine if the Commissioner applied the correct legal standards in determining that the claimant is not disabled. See Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984) ("Failure to apply the correct legal standards is grounds for reversal."). Therefore, the reviewing court first evaluates the Commissioner's application of the

pertinent legal standards, and then, if the standards were correctly applied, considers the substantiality of the evidence. See Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987) (stating that "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles").

## V.   Discussion

### A.   Failure to Find Plaintiff's Depression to be a "Severe" Impairment at Step Two

Plaintiff's first challenge pertains to step two of the five-part analysis, which requires the Commissioner to determine whether a claimant has a "severe" impairment, defined as "any impairment or combination of impairments which significantly limits physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(a)(4)(ii), (c); 416.920(a)(4)(ii), (c). The "mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment" is not, by itself, sufficient to render a condition "severe." Coleman v. Shalala, 895 F. Supp. 50, 53 (S.D.N.Y. 1995) (citations omitted). Nevertheless, the Second Circuit has instructed that step two "may do no more than screen out de minimis claims." Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995) (citations omitted). Furthermore,

the Second Circuit's case law "is plain that 'the combined effect of a claimant's impairments must be considered in determining disability; the [Commissioner] must evaluate their combined impact on a claimant's ability to work, regardless of whether every impairment is severe.'" Burgin v. Astrue, 348 F. App'x 646, 648 (2d Cir. 2009) (unpublished opn.) (quoting Dixon, 54 F.3d at 1031).

Here, the ALJ summarily found, without analysis, that Plaintiff has only two impairments that qualify as "severe"-generalized anxiety disorder and PTSD. However, this finding ignores the fact that Plaintiff has received diagnoses of panic disorder with agoraphobia and major depressive disorder consistently throughout his medical history, and has been prescribed specific medications to treat these conditions. The ALJ gave no explanation as to why he did not consider these other diagnosed impairments to be "severe" for purposes of step two.

The Commissioner has attempted to supply a post hoc rationalization for this omission, noting that state agency review psychologist Dr. Clay found that Plaintiff has "symptoms" of PTSD and "possibly" generalized anxiety disorder but "no obvious depression or psychosis." T.269. This rationale does not stand up to scrutiny, because there are a few treatment notes in which PTSD is listed as a "rule out" diagnosis or is not listed as a diagnosis at all. The ALJ, however, accepted that PTSD is one of Plaintiff's severe impairments. Furthermore, Plaintiff received diagnoses of

major depressive disorder throughout the medical records Dr. Clay reviewed.[5] In addition, both the ALJ and Dr. Clay ignored Plaintiff's repeated diagnoses of panic disorder with agoraphobia.[6] The Commissioner argues the ALJ was justified in excluding Plaintiff's major depressive disorder from step two because, in her February 28, 2010 assessment, ARNP McCool did not specifically diagnose Plaintiff with depression. However, ARNP McCool stated that Plaintiff had experienced two severe depressive episodes since moving to New York. In addition, at numerous number of previous visits, ARNP McCool had given a specific disorder of major depressive disorder. Treating psychologist Dr. Fleishman found that Plaintiff's "significant depressive episodes unrelated to life circumstances, suggest[ed] an underlying biological or genetic component to his mood disorder."

In sum, Plaintiff has been diagnosed with multiple mental health disorders: PTSD, GAD, panic disorder with with agoraphobia, major depressive disorder, NOS; and, most recently, mood disorder, NOS.[7] These disorders represent separately diagnosed

---

[5]

See T.231 (10/05/07), 218 (11/07/08), 213 (2/01/08), 211 (3/28/08), 208 (6/20/08), 296 (9/10/08; dysthymia), 248 (11/19/08), 246 (3/16/09), 247 (1/19/09), 245 (4/13/09), 244 (6/08/09), 243 (9/01/09), 275 (2/18/10; mood disorder).

[6]

See T.218 (11/07/07), 213 (2/01/08), 211 (3/28/08), 296 (9/10/08), 252 (9/17/08), 249 (10/15/08), 248 (11/19/08), 246 (3/16/09), 247 (1/19/09), 245 (4/13/09), 244 (6/08/09), 243 (9/01/09), 240 (10/15/09), 275 (2/18/10).

[7]

A variety of depressive illnesses, including major depressive disorder and bipolar disorder, fall in the category of "mood disorders," as specified in the

psychopathologies.[8] The National Institute of Mental Health's website explains that panic disorder, obsessive-compulsive disorder, post-traumatic stress disorder, social phobia (or social anxiety disorder), specific phobias (such as agoraphobia), and generalized anxiety disorder are all classified as anxiety disorders but each one has different symptoms.[9] Furthermore, depressive disorders are in a separate category than anxiety-related disorders. The ALJ, however, ignored Plaintiff's panic disorder with agoraphobia and depressive disorder, and thereby failed to meaningfully consider the combined, impairing effects of Plaintiff's separate diagnoses. Furthermore, the error was not harmless. See Burgin, 348 F. App'x at 648-49 (remanding for a new step two severity analysis that should include all of plaintiff's diagnosed mental impairments).

### B.   Failure to Properly Weigh ARNP McCool's Opinion

Plaintiff argues that the ALJ erred in evaluating ARNP McCool's opinion, to which the ALJ accorded "little weight" "since [it] is that of an unacceptable medical source." T.45.

---

Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, Text Revision (DSM-IV-TR; APA, 2000).

[8]   See http://www.nimh.nih.gov/health/publications/anxiety-disorders/index.shtml (last accessed Nov. 14, 2014); http://www.nimh.nih.gov/health/publications/depression/index.shtml (last accessed Nov. 14, 2014).

[9]   See http://www.nimh.nih.gov/health/publications/anxiety-disorders/index.shtml (last accessed Nov. 14, 2014).

The Commissioner is correct that nurse practitioners are not "acceptable medical sources" under the Social Security Regulations. 20 C.F.R. §§ 404.1523(a), 416.913(a). However, a nurse practitioner is included among "other sources," whose opinions are "important and should be evaluated on key issues such as impairment severity and functional effects." SSR 06-03p, 2006 WL 2329939, at *3 (Aug. 9, 2006); 20 C.F.R. §§ 404.1523(d)(1), 416.913(d)(1). A district court may review an ALJ's decision not to do so. Baron v. Astrue, No. 11 Civ. 4262(JGK)(MHD), 2013 WL 1245455, at *26 (S.D.N.Y. Mar. 4, 2013) (citing White v. Commissioner of Soc. Sec., 302 F. Supp.2d 170, 176 (W.D.N.Y. 2004)).

While an "other source" opinion is not treated with the same deference as a treating physician's opinion, the assessment is still entitled to some weight, especially when there is a treatment relationship with the claimant. See Mongeur v. Heckler, 722 F.2d 1033, 1039 n. 2 (2d Cir. 1983) (stating that the opinion of a treating nurse practitioner "is entitled to some extra consideration"); other citations omitted); Pogozelski v. Barnhart, No. 03-CV-2914, 2004 WL 1146059, at *12 (E.D.N.Y. May 19, 2004) (finding that "some weight should still have been accorded to [the therapist's] opinion based on his familiarity and treating relationship with the claimant"). The Social Security Administration ("the SSA") has recognized that "[w]ith the growth of managed health care in recent years and the emphasis on

containing medical costs, medical sources who are not 'acceptable medical sources,' such as nurse practitioners . . . have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists." SSR 2006 WL 23299939, at *3. As a consequence, the SSA has stated that opinions from these sources "are important" with regard to evaluating "key issues such as impairment severity and functional effects. . . ." Id.

Furthermore, "[c]onsideration of an opinion from someone who is not an 'acceptable medical source' may be particularly important where . . . that person is the 'sole source that had a regular treatment relationship with plaintiff.'" Philpot v. Colvin, No. 5:12-CV-291 (MAD/VEB), 2014 WL 1312147, at *5 (N.D.N.Y. Mar. 31, 2014) (quoting White, 302 F. Supp.2d at 176). Here, ARNP McCool is the only medical professional who actually treated with, and examined Plaintiff before providing an assessment of his functional limitations. Furthermore, the ALJ's justification for giving the greatest weight to Dr. Clay's opinion is contradicted by the record: The ALJ stated that Dr. Clay's opinion was "supported by findings [sic] on psychological examination and is consistent with other evidence of record when viewed as a whole." Dr. Clay only reviewed Plaintiff's medical records up until November 2009, and did not examine Plaintiff. Therefore, Dr. Clay could not have obtained "findings on psychological examination". Moreover, the

majority of the "findings on psychological examination" in the record were made by ARNP McCool, whose opinion the ALJ discounted. The ALJ's statement simply does not make any sense.

SSR 06-3p explicitly states that "depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source'" such as when the "other source" "has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion." SSR 06-3p, 2006 WL 2329939, at *2 (S.S.A. Aug. 9, 2006). The factors referenced in SSR 06-3p for weighing opinion evidence favor giving greater weight to ARNP McCool's opinion. First, ARNP McCool had a longitudinal treatment relationship with Plaintiff, beginning in September 2008. Plaintiff attended appointments at regular intervals with ARNP McCool throughout this time and, after he moved out of state, continued to treat with her via phone consultations. ARNP McCool's opinion is consistent with the reports of the psychiatric nurse practitioner who previously treated Plaintiff and with treating clinical psychologist Dr. Fleishman. In each of her functional assessments, ARNP McCool identified evidence to support her opinions regarding Plaintiff's specific limitations and provided narrative explanations. ARNP McCool's area of specialty is mental and

behavioral health.  Finally, as noted above, ARNP McCool is the only reporting source who had a regular treatment relationship with Plaintiff.  See SSR 06-03p, 2006 WL 2329939, at *4-*5 (listing factors to be considered in evaluation opinions from "other sources").

The Court finds that the ALJ erred in failing to give ARNP McCool's observations and conclusions more consideration in determining whether or not Plaintiff suffered from a combination of disabling mental impairments during the relevant time period. See Westphal v. Eastman Kodak Co., No. 05-CV-6120, 2006 WL 1720380, at *4-*5 (W.D.N.Y. June 21, 2006) (in cases involving psychological impairments, opinion of a medical professional who has examined the claimant face-to-face is more reliable than that of a non-examining physician). It was error for the ALJ to reject ARNP McCool's opinion simply because it was the opinion of a nurse practitioner. See, e.g., Gillies v. Astrue, No. 07-CV-517, 2009 WL 1161500, at *6 (W.D.N.Y. Apr. 29, 2009) (vacating and remanding solely for calculation of benefits where ALJ rejected opinion of nurse practitioner solely because "nurse practitioners are not necessarily considered to be acceptable sources of medical evidence" (internal marks omitted); Canales v. Commissioner of Soc. Sec., 698 F. Supp.2d 335, 344 (E.D.N.Y. 2010) ("The ALJ dismissed Rodriguez's findings in their entirety because Rodriguez was a social worker, not a psychiatrist. In reaching that conclusion, the

ALJ did not comply with—or consider—the requirements of Social Security Ruling 06-03p.").

The ALJ also found that ARNP McCool's opinion was entitled to "little weight" because she indicated that Plaintiff "would be unable to meet competitive standards in dealing with normal work stress and interacting appropriately with the general public, and thus would be absent from work three days a month." T.45. Thus, the ALJ rejected ARNP McCool's opinion <u>because</u> it reached a conclusion with which the ALJ disagreed-that Plaintiff is disabled. This is clearly improper. <u>See</u> <u>Faherty v. Astrue</u>, No. 11-CV-02476(DLI), 2013 WL 1290953, at *14 (E.D.N.Y. Mar. 28, 2013) ("The ALJ explained the reason for giving [the consultative examiner's] medical source statement significant weight was that it was consistent with her RFC. Such reasoning is circular and flawed. The ALJ should use medical opinions to determine Plaintiff's RFC, and, therefore, cannot give medical opinions weight based on their consistency with the RFC.") (internal citation to record omitted).

### C.  Erroneous Credibility Finding

Plaintiff contends that the ALJ did not apply the appropriate legal standards in determining the weight to be accorded his testimony regarding his symptoms and limitations.

Under the regulations, an ALJ first must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms he alleges,

and if so, the ALJ then must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record. See 20 C.F.R. §§ 404.1529(a), 416.929(a). In making this credibility determination, the regulations direct ALJs to consider several factors. See, e.g., Meadors v. Astrue, 370 F. App'x 179, 184 n. 1 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vii)); SSR 96-7p, 1996 WL 374186, at *3. "Where the ALJ fails sufficiently to explain a finding that the claimant's testimony was not entirely credible, remand is appropriate." Valet v. Astrue, No. 10-CV-3282(KAM), 2012 WL 194970, *22 (E.D.N.Y. Jan. 23, 2012) (citation omitted).

Here, the ALJ identified the correct legal standard but failed to apply it, concluding summarily that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were "not credible to the extent they are inconsistent with the above residual functional capacity assessment." T.44. It is erroneous for an ALJ to find a claimant's statements not fully credible because those statements are inconsistent with the ALJ's own RFC finding. See, e.g., Nelson v. Astrue, No. 5:09-CV-00909, 2010 WL 3522304, at *6 (N.D.N.Y. Aug. 12, 2010) (recommending remand for, inter alia, a proper analysis of Plaintiff's credibility as "the propriety of the ALJ's finding that Plaintiff was credible only to the extent that her statements

were consistent with his own RFC determination is questionable"), report and recommendation adopted, 2010 WL 3522302 (N.D.N.Y. Sept. 1, 2010). Because the assessment of a claimant's ability to work will often depend on the credibility of his subjective complaints, it is illogical to decide a claimant's RFC prior to assessing his credibility. Otero v. Colvin, 12-CV-4757, 2013 WL 1148769, at *7 (E.D.N.Y. Mar. 19, 2013); see also Molina v. Colvin, No. 13 Civ. 4989(AJP), 2014 WL 3445335, at *14 (S.D.N.Y. July 15, 2014). Using that RFC to discredit the claimant's subjective complaints then merely compounds the error. Otero, 2013 WL 1148769, at *7.

The ALJ gave a second reason for discounting Plaintiff's credibility, which is not supported by the record or by relevant caselaw. The ALJ asserted that Plaintiff's "alleged medical complaints . . . are not supported by medical findings and they are contradicted by medical doctors, the assessments of the consultative examiner, the vocational expert's testimony, and the claimant's own activities, such as providing for his own personal grooming, laundry, cleaning, and taking care for [sic] his dog." T.44. Contrary to the ALJ's assertion, Plaintiff's subjective complaints have been well-documented by his treatment providers, including clinical psychologist Dr. Fleishman. Moreover, Dr. Clay is not a "consultative examiner". As noted above, Dr. Clay's involvement simply was to review Plaintiff's medical records.

Furthermore, the VE did not offer testimony concerning Plaintiff's impairments and functional limitations. If he had done so, he would have been testifying outside his area of competency or expertise, and that testimony would have been improper. Finally, Plaintiff's ability to perform minimal activities of daily living and self-care does not, by itself, contradict his allegations of disability. Woodford v. Apfel, 93 F. Supp.2d 521, 529 (S.D.N.Y. 2000) (citation omitted); See Poole v. Railroad Retirement Board, 905 F.2d 654, 664 (2d Cir. 1990) ("[Plaintiff] need not be a complete invalid to be entitled to benefits.")

### D.   Incomplete Hypothetical

Plaintiff asserts that the ALJ erred at step 5 because the hypothetical question posed to the VE did not completely and accurately portray Plaintiff's limitations.

At step five, the ALJ relied on the testimony of the VE to establish that "there is other gainful work in the national economy which the claimant could perform." Balsamo v. Chater, 142 F.3d 75 (2d Cir. 1998). This is proper, as long as there is "substantial record evidence to support the assumption upon which the vocational expert based his opinion." Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir. 1983).

Whether the ALJ's hypothetical was incomplete depends on whether he properly weighed ARNP McCool's mental RFC questionnaire opinion and correctly accounted for all of Plaintiff's limitations

in the RFC assessment. As discussed above, the Court finds that the ALJ erred with regard to the step two severity determination in failing to consider Plaintiff's depression and panic disorder with agoraphobia to be severe impairments. Symptoms and limitations caused by those impairments, such as Plaintiff's difficulties in dealing with the general public, were not included in the ALJ's RFC assessment. In addition, the ALJ erred in weighing ARNP McCool's opinion and did not factor into his RFC several of the work-related functional limitations found by ARNP McCool. It follows that the RFC assessment did not account for the full spectrum of Plaintiff's limitations, and the ALJ's hypotheticals based on that RFC assessment likewise were incomplete. A VE's opinion in response to an incomplete hypothetical question cannot provide substantial evidence to support a denial of disability, and remand therefore is required. See DeLeon v. Secretary of Health and Human Servs., 734 F.2d 930, 936 (2d Cir. 1984) (finding that, as a result of the ALJ's failure to present the full extent of the claimant's physical disabilities, the record provided no basis for drawing conclusions about whether the claimant's impairments rendered him disabled).

## V.   Remedy

Under 42 U.S.C. § 405(g), the district court has the power to affirm, modify, or reverse the ALJ's decision with or without remanding for a rehearing. Remand for additional fact development may be appropriate if "there are gaps in the administrative record

or the ALJ has applied an improper legal standard." <u>Rosa v. Callahan</u>, 168 F.3d 72, 82-3 (2d Cir. 1999). The standard for directing a remand for calculation of benefits is met when the record persuasively demonstrates the claimant's disability, <u>Parker v. Harris</u>, 626 F.2d 225, 235 (2d Cir. 1980), and where there is no reason to conclude that the additional evidence might support the Commissioner's claim that the claimant is not disabled, <u>Butts v. Barnhart</u>, 388 F.3d 377, 385-86 (2d Cir. 2004).

Had the ALJ not erred in evaluating Plaintiff's severe impairments at step two, weighing ARNP McCool's opinion, and analyzing Plaintiff's subjective complaints, he would have arrived at an RFC inconsistent with testimony from the VE that there exist jobs in the national economy Plaintiff can perform. The record here has already been developed fully for the relevant period, and there is persuasive proof of Plaintiff's disability. Therefore, a remand for further administrative proceedings to correct the above-discussed errors would serve no purpose, and remand for the calculation of benefits is warranted. <u>See</u>, <u>e.g.</u>, <u>Muntz v. Astrue</u>, 540 F. Supp.2d 411, 421 (W.D.N.Y. 2008).

## VI. Conclusion

For the reasons set forth above, the Commissioner's motion (Dkt #12) for judgment on the pleadings is denied. Plaintiff's motion (Dkt #11) to remand for calculation and payment of benefits

is granted. The final decision of the Commissioner is reversed, and the matter is remanded for calculation and payment of benefits.

**SO ORDERED**.

S/Michael A. Telesca

_____

HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:       November 17, 2014
             Rochester, New York